[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal and application for review of the statement of compensation filed in connection with the taking of the plaintiffs' property at 935 South Street, also known as State Route 75, Suffield, in condemnation proceedings brought by the defendant.
Pursuant to General Statutes Sections 48-6, 48-12 and 8-129, on May 18
1993, the defendant took the subject property by eminent domain and filed a CT Page 1766 statement of compensation filing damages at $122,000. The plaintiffs have appealed under the provisions of General Statutes Section 8-132. In the adjudication of this appeal and review of the statement of compensation, the court heard evidence, including the testimony of expert appraisers, their appraisal reports and other documentary evidence, and viewed the subject property, its surrounding area, and the comparable properties offered in support of the parties' respective claims.
The subject property consists of a parcel of land containing 1.26 acres upon which is located a one-story small wood-enclosed and roofed structure under construction since April 5, 1993, for an eight-stool ice cream restaurant. The property was purchased by the plaintiffs on July 16, 1987, for $165,000. At the time it was residential, consisting of a single-family home, reportedly constructed about 1825, and two outbuildings.
After the acquisition of the subject property, plaintiff Kerry J. Caldon was appointed a member of the defendant Suffield Economic Development Commission in January of 1988. Beginning with its meeting on December 15, 1988, the defendant commission took formal steps for the development of an industrial park. Pursuant to a resolution of the Board of Selectmen, the commission voted to apply to the state agency for the planning phase and assistance in the creation of an industrial park. Plaintiff Kerry J. Caldon supported this move as a member of the defendant commission.
At the next meeting, held on January 26, 1989, the motion made by member Caldon to hire DeCarlo Doll to perform initial engineering studies and to help develop the project plan for the industrial park was unanimously approved. At a special meeting of the defendant commission held on March 2, 1989, plaintiff Caldon seconded the motion authorizing the commission to apply on behalf of the town to the Connecticut Department of Economic Development for a planning grant. The planning grant was approved by the state agency on March 31, 1989. Thereafter, on April 20, 1989, the chairman was authorized to enter into a contract with the engineers DeCarlo Doll. This contract was approved by the commission, plaintiff Kerry Caldon being then present, and executed by its chairman on July 20, 1989.
Plaintiff Kerry Caldon, as a member of the defendant commission during this period that the town industrial park was under consideration, had knowledge thereby of the town's plans for the establishment of such an industrial area. At some time before the plaintiffs' demolition of the residence on the subject property to its ground floor level for the purpose of constructing the proposed eight-stool ice cream restaurant, plaintiff Kerry Caldon was informed by the chairman of the defendant commission that the town was going to condemn the subject property. Formal notice of the town's intention to acquire the property was given to the plaintiffs in CT Page 1767 April, 1993.
The Suffield Zoning and Planning Commission on December 7, 1992, approved the plaintiffs' application for a site plan review for the ice cream restaurant. This approval was obtained only after the North Central District Health Department informed the planning and zoning commission by letter on September 11, 1992, that the Director of Health had granted an exception to the plaintiffs to allow the installation of eight seats in the restaurant with no availability of public rest rooms, and limiting waste water usage to 333 gallons a day per septic system design. Under the applicable zoning regulations outdoor service, window counter service and consumption on the premises outside of the enclosed structure were prohibited.
A demolition permit was obtained on March 11, 1993, On April 5, 1993, a building permit was issued to convert the former residential structure into a restaurant containing 874 square feet of gross building area for an estimated cost of $30,000. Construction of the frame structure then began until terminated by the taking of the subject property on May 18, 1993.
It is the conclusion of the court that the plaintiffs were attempting a quick change of the residential use of the subject property to a commercial project fitting the structure's footprint before its taking by the defendant in eminent domain. The result of their effort was a small unfinished wood-frame structure intended to contain an eight-seat ice cream parlor with very limited, restricted and foreseeable unprofitable ice cream sales and service potential. The proposed enterprise would have been neither an ice cream parlor nor a restaurant in the common acceptance of the terms. Its unfeasibility and impracticality are self-evident.
The subject site is an L-shaped parcel of land containing 1.26 acres of land situated on the westerly side of South Street (Route 75). Its frontage is 150 feet. The southerly boundary is 275.06 feet; the westerly boundary is 300 feet; the rear portion of the northerly line is 100 feet; the rear portion of the easterly boundary is 168 feet; and the front portion of the northerly line is 198 feet. The grade is about two to three feet above street level for a depth of about 100 feet. It then slopes downward in northwesterly direction to a pond located at the rear of the property. The rear area is located within wetlands.
The subject property is situated within the Planned Development Industrial Park (PDIP) zoning district. The defendant commission has proposed development of the subject site and two adjacent parcels, containing 94.613 acres combined, into a 14-lot industrial subdivision. Costs associated with the extension of water and sewer mains as well as CT Page 1768 development of a cul-de-sac to serve the industrial park are to be shared by the town and the state, which is sponsoring the program through the Municipal Industrial Development Program.
The most recent revaluation of real estate in the town was completed in 1989. The subject property was then valued at 70% of fair market value as follows: land $59,360; dwelling $44,590; outbuildings $2,030; total assessment $105,980.
David N. Collins testified as the appraiser for the plaintiffs. He valued the property in its incomplete state on the date of taking as a partially constructed one-story frame "ice cream parlor restaurant." In his opinion the highest and best use of the site was for its planned use as an ice cream restaurant, thus giving shallow support to the plaintiffs in their purported change of use of the property before its condemnation.
In his analysis of the fair market value of the subject property as of the date of taking, the plaintiffs' appraiser utilized the cost approach to estimate the value of the incomplete structure and the sales comparison approach to determine the value of the land. As of the date of taking, the structure consisted only of a foundation, floor structure, wood framing, vinyl siding and a roof with a lookout tower in its center. The westerly or rear portion was open to allow viewing of planes in the distance at Bradley International Airport. Based on the plaintiffs' inflated demolition and construction costs of $66,716.06, the appraiser estimated the value of the unfinished structure to be $66,700.
Six comparable sales within the town were utilized to determine the square foot value of the subject land. Based on these, he estimated the value of the acreage at $4.50 per square foot for a total land value of $247,000. Recapitulating these building and land values, he determined the fair market value of the subject property at the time of taking to be $313,700.
Edward F. Heberger testified as the appraisal expert for the defendant. He had previously appraised the property in July 1992 when it was rented as a residence. At that time he found its highest and best use to be residential and its total fair market value to be $115,000. $70,000 of that valuation he allocated to land.
A second appraisal was made as of the date of the taking of the unfinished restructure. In his review of the highest and best use at this time, it was his opinion that the residual value created by a use similar to that proposed by the plaintiffs would be negligible as compared to alternative commercial and industrial uses permitted within the PDIP zone CT Page 1769 and consistent with the plan of development of this area. He found that overall, the highest and best use of the subject property as though vacant would be commercial or industrial development upon the extension of water and sewer mains. Commercial or industrial use would yield the highest return to the land. He noted, however, that the highest and best use conclusion is not completely dependent on the extension of utility mains. The subject property could support commercial or light industrial development as is by utilizing on-site septic and well systems.
With this conclusion the court agrees. The property is situated on the westerly side of Route 75. It is reasonably well situated relative to both the local and interstate highway networks. Its proximity to Bradley International Airport adds to its suitability for industrial or commercial development.
In his analysis of the contributory value of the unfinished wood frame structure, the defendant's appraiser estimated its replacement cost utilizing cost approach techniques. It was his opinion that a purchaser may foresee use of this structure in an overall larger development at the subject property. Referring to Marshall and Swift's Residential CostHandbook, he calculated the total replacement cost of the unfinished structure to be $19,000. There being no deduction for accrued depreciation, he estimated its contributory value at $19,000.
The market value of the land was calculated by the sales comparison approach. Sales of four industrial sites three to ten miles distant from the subject property were utilized in his comparison:
(1) 1.17 acres sold in East Granby on July 2, 1993, for $94,017 per acre;
(2) 9.53 acres sold in Windsor on September 1, 1992, for $52,466 per acre;
(3) 1.08 acres sold in Enfield on April 29, 1992, for $67,251 per acre;
(4) 3.872 acres sold in East Granby on August 30, 1990, for $64,821, per acre.
All four sales were adjusted downward as compared to the subject property for various reasons specified. It was his opinion that the subject property had an inferior location and somewhat inferior physical characteristics as compared to his four sales. Based on these adjustments for the elements of comparison, it was his opinion that the market value of the subject property at the time of taking was $55,000 per acre, or a total CT Page 1770 value of $63,300, rounded to $70,000, for 1.26 acres.
Based upon these calculations, the defendant's appraiser computed the total market value of the subject property as follows: Land — $70,000; contributory value of unfinished structure — $19,000; total market value — $89,000.
A state referee sitting as a court on appeals in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of our courts with the duty of making an independent determination of value and fair compensation in the light of all circumstances, the evidence, his general knowledge and his viewing of the premises. Minicucci v.Commissioner of Transportation, 211 Conn. 383, 388 (1989); Birnbaum v. Ives,163 Conn. 12, 21-22 (1972); Fiegenbaum v. Waterbury, 20 Conn. App. 148, 153
(1989). It is his task to reach a result that gives the plaintiffs, as nearly as possible, a fair equivalent in money as just compensation for the land and building taken. Mathis v. Redevelopment Agency, 165 Conn. 622, 623
(1973); Fiegenbaum v. Waterbury, supra, 153-54.
Based upon a full consideration of the evidence offered by the partied, a careful viewing of the subject premises, its surrounding area and of the comparable sales upon which the appraisers relied, a review of relevant factors, such as the highest and best use of the property, it size, shape, topography, zoning classification, location and proximity to Bradley International Airport, local and interstate highway networks, and my own knowledge of the elements constituting value, I find that the value of the plaintiffs' land is $87,000 per acre for a total value of $109,620, rounded to $110,000, and that the contributory value of the unfinished structure is $19,000. The total value of the plaintiffs property is $129,000.
It is concluded, therefore, that the statement of compensation for the taking of the plaintiffs' property be revised to state that $129,000 is the compensation to be paid for such taking. The defendant shall pay to the plaintiffs the amount of the deficiency, as above determined, with interest at 10% per annum on such deficiency from the date of taking to the date of payment, together with costs and an appraisal fee of $700.
It is so ordered.
William C. Bieluch State Trial Referee CT Page 1771